# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 9, 2010 Session

## STATE OF TENNESSEE v. MICHAEL W. KEMP

**Direct Appeal from the Criminal Court for Smith County**
**No. 05-234     John Wootten, Judge**

---

**No. M2010-00603-CCA-R3-CD - Filed April 18, 2011**

---

The defendant, Michael W. Kemp, was convicted by a Smith County Criminal Court jury of three counts of reckless vehicular homicide and three counts of reckless endangerment with a deadly weapon. The trial court sentenced the defendant to three years for each vehicular homicide conviction and one year for each reckless endangerment conviction. The court merged the reckless endangerment convictions into the vehicular homicide convictions and ordered that the terms run consecutively with all but one year served on probation. The defendant appealed and, on direct appeal, this court remanded for reconsideration of the consecutive sentences because the trial court failed to make the proper findings. Upon remand, the trial court again imposed consecutive sentences, which the defendant now appeals. After review, we conclude that the trial court erred in imposing consecutive sentencing and order that the defendant's sentences be served concurrently.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as Modified**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

G. Jeff Cherry and David Veile, Lebanon, Tennessee, for the appellant, Michael W. Kemp.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Howard L. Chambers, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This court succinctly summarized the evidence presented at trial on the original direct appeal of this matter. See State v. Michael W. Kemp, No. M2008-01624-CCA-R3-CD, 2009 WL 2342909, at *1-6 (Tenn. Crim. App. July 31, 2009). The proof showed that a red Toyota crashed into a tree at the bottom of a roadside embankment, as the result of the Toyota's involvement in a chase with a Dodge pickup truck owned and driven by the defendant. The crash caused the deaths of the three passengers inside the Toyota – Jimmy Bane, Tommy Lee Gooch, and Anthony Billings. A semi-automatic nine-millimeter Ruger pistol, with its clip containing four rounds of ammunition, was found under the driver's seat of the crashed Toyota, and a black holster was found on the ground nearby. A shell casing, fired from the Ruger, was found in the road on the other side of a nearby hill. Upon inspection of the Dodge truck, officers noted two bullet impacts to its front grille and damage to its lower front grille, including red paint transfer.

An expert in crash reconstruction testified that tire marks near the location where the Toyota left the road indicated that the car had made a sharp right turn off the road with the car leaning heavily on the left edge of its tires. The wheels were rotating at the time the marks were left and there was no indication that the driver applied his brakes hard enough to create skidding. There were four debris sites, signifying four areas of contact between the vehicles. (IV: 131-136; 140)

The defendant gave two statements to police. In the first statement, the defendant said that "a little red car" with three men inside pulled into his driveway around midnight on February 27, 2005. The defendant knew one of the men as Bane but did not know the other men. They asked the defendant if he knew where they could purchase some marijuana and when the defendant told them, "No," they offered to sell the defendant crack cocaine. When the defendant declined, the men left.

The defendant continued in his statement, stating that he and his young son went to bed not long after the encounter, but he was awakened by the sound of his dogs barking and the house door slamming. He got up in time to see "the little red car" backing out of his driveway. The defendant said that he went to get his nine-millimeter Ruger handgun from under the sofa cushion and discovered that it was missing. The defendant gave chase to the red car and continued the pursuit despite someone in the backseat, whom he believed to be Bane, firing shots at him. He said that the driver of the red car also started shooting at him. The defendant asserted that the driver of the red car slammed on his brakes, causing the defendant to hit the car and send it over the embankment. He said that the driver had also put on the brakes another time during the pursuit, but he had barely hit the car that time. The defendant claimed that Bane had been to his house before and knew that he kept a gun under the sofa cushion.

The defendant later gave a signed addendum to his statement in which he elaborated that the Toyota applied its brakes on three different instances, causing him to collide with the car three times. He said that the third time the Toyota applied its brakes, he tried to avoid a collision by veering to the left, but he hit the car anyway, causing it to leave the road.

Officers subpoenaed telephone records which showed that someone used the phone number associated with Bane to call the defendant's land line eleven times between 9:26 p.m. on February 25 and 9:28 p.m. on February 26. Someone used the defendant's land line to call Bane's number at 10:59 p.m. on February 25.

Toxicology reports revealed that Bane's blood was negative for alcohol but positive for cocaine in the amount of .09 micrograms per milliliter, as well as cocaine metabolites and Valium. Gooch had a blood alcohol content of .03%, and his blood contained cocaine in the amount of .20 micrograms per milliliter as well as cocaine metabolites. Billings, the driver of the Toyota, had a blood alcohol content of .19%, and his blood contained cocaine in the amount of .17 micrograms per milliliter as well as cocaine metabolites. The defendant's blood was negative for alcohol but contained cocaine in the amount of .07 micrograms per milliliter as well as Prozac and Prozac metabolites. The defendant's blood, however, did not contain any metabolites of cocaine which indicated that the defendant had used cocaine recently.

The defendant testified at trial that Bane had visited him on the evening of February 25, 2005, in order to use his phone and, during that visit, Bane noticed the gun under the sofa cushion and the two of them discussed it. The defendant described his chase of the red Toyota and claimed that it was never conducted at high speed. The defendant claimed that after one of the impacts with the Toyota, he experienced difficulty with his power steering and power brakes and, realizing he was near the police station, began honking his horn to alert officers of his predicament. However, he observed that there was "[n]ot one police officer around it, not one cop car, not a police officer, nothing, nowhere around." On rebuttal, Police Chief Steven Hopper testified that there were always police cars at the station and there would have been someone there on February 27, although no one routinely sat outside the building.

The defendant testified that he proceeded after the Toyota because Bane, being the sheriff's nephew, "got away with everything," and he did not want to risk his gun being used in a future crime. As the defendant rounded a corner, he saw the Toyota and, having "no power steering [and] . . . no power brakes[,] . . . [he] bumped them." The Toyota "took off" and then slammed on its brakes again. The defendant said that he attempted to maneuver around the car but "bumped them just barely," causing the car to "sho[o]t off" the side of the road into a ditch. Immediately after he saw the Toyota go into the ditch, the defendant

drove to the sheriff's department and reported the night's incidents. The defendant characterized the entire encounter as a "follow behind," not a chase.

## ANALYSIS

No additional evidence was presented at the second sentencing hearing. The presentence report was offered into evidence at the first hearing. Billy Jernigan, victim Billings' grandfather, and Howard Thurman, victim Gooch's brother-in-law, testified to the impact the victims' deaths had on their families and the requested amounts of restitution and hopeful sentence.

Paul Bruno and Mary Parker testified concerning their positive business dealings with the defendant and the defendant's reputation for truthfulness. Bruno stated that when he spoke to the defendant after the incident, the defendant was "very upset . . . [and] wish[ed] with his entire heart that [it] never ever happened." Bruno believed that "[the defendant] w[ould] do whatever he c[ould] to keep any kind of situation like this from happening again." Parker observed that the defendant "was in pain about the death of these men. . . . [H]e felt so bad that he didn't just take the license plate number and go home or that he didn't just stay home and forget the stupid gun." Marika Williams, the defendant's friend and employee, testified that the defendant was a hard-working, peaceful man.

Amber Bell, the defendant's adult daughter, testified that the defendant had always been a good father and provided financially for their family. She explained that the defendant assumed custody of his brother's daughter, Cheyanna, after the defendant's brother passed away, and Cheyanna was presently eleven years old. She said that the defendant was remorseful for the victims' deaths.

In a statement of allocution, the defendant expressed that he "made a foolish decision that night" and that he was sorry that he could not change his actions and the results. He stated that his brother died in 1999 and then his mother, father, and sister died in 2003, so he "know[s] what it is like to lose someone, and knowing that [his] actions are the result of these men dying is almost more than [he] can bear."

Following the second sentencing hearing, the trial court again imposed consecutive sentences, which the defendant challenges on appeal. When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v.

-4-

Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of a number of criteria applies, including that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4) (2006). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that an extended sentence is necessary to protect the public from further criminal conduct of the defendant and the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

In imposing consecutive sentences, the trial court found that the fact the defendant was involved in a "chase" that led to a collision "in the middle of downtown Carthage" and then ultimately led to a major collision resulting in the victims' deaths showed that the defendant's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. The court found that the defendant took "the law into his own hands and commit[ted] this series of events,"

indicating that consecutive sentencing was necessary to protect the public from the defendant. The court determined that to not impose consecutive sentencing would diminish the severity of the offenses given that the result of the defendant's conduct was the death of three individuals.

Recently, in State v. Matthew Joseph Carter, No. E2009-00217-CCA-R3-CD, 2010 WL 4324386, at *9 (Tenn. Crim. App. Nov. 2, 2010), a panel of this court reversed the trial court's imposition of consecutive sentences on the dangerous offender factor because the trial court "did not mention any 'particular facts' upon which it based its finding that an extended sentence was necessary to protect the public." Id. In that case, the twenty-four-year-old defendant, standing convicted of second degree murder, two counts of attempted second degree murder, and three counts of aggravated assault, stemming from his dropping items such as rocks and bricks from a bridge overpass at vehicles, had an adult criminal record consisting of three misdemeanor convictions and claimed to want to improve his life and cause no further harm to society. Id. This court observed that although the defendant's conduct clearly caused devastating results, the trial court's findings indicated that it imposed consecutive sentences based solely on the severity of the offenses, which did not conform to the mandates of Wilkerson. Id.

This is precisely the situation in this case. The defendant's conduct certainly led to devastating results – the deaths of three individuals. However, there is simply no support in the record for a finding that consecutive sentences were necessary to protect the public from further criminal acts of the defendant.

The forty-seven-year-old defendant had no prior criminal record. Witnesses testified that he was remorseful for the loss of the victims' lives, and numerous letters were submitted informing the court of the defendant's highly-regarded character. Although the incident was clearly tragic, the crime was not committed in "an extraordinarily wanton or violent manner [n]or, after the[] crime, [did the defendant] act[] in a way that suggested [he] would offend again." See State v. Tammy R. Flatt, No. M2008-01959-CCA-R3-CD, 2009 WL 4438285, at, *21 (Tenn. Crim. App. Dec. 2, 2009) (noting that our case law "reveals that defendants found to be "dangerous offenders" under Wilkerson's first prong typically either committed their crime in an extraordinarily wanton or violent manner or, after their crime, acted in a way that suggested they would offend again"). Instead, the evidence indicates that this was a one-time singular episode of recklessness, instigated by the theft of the defendant's gun and compounded by his being shot at by the victims. Interestingly, the trial court's imposition of a sentence of split confinement, with one year in confinement and the remainder on probation, indicates that the defendant was not considered a danger to the public. In fact, according to the sentence imposed by the trial court, the additional years from the consecutive sentencing are to all be served out in society – on probation. We,

therefore, conclude that the trial court erred in ordering consecutive sentencing, and we order that the sentences are to be served concurrently. The trial court ordered that the defendant serve one year in split confinement, and we do not disturb that determination.

## CONCLUSION

Based on the foregoing authorities and reasoning, we reverse the trial court's imposition of consecutive sentencing and order that the defendant's sentences be served concurrently.

_____
ALAN E. GLENN, JUDGE